**PUBLISHED**

**UNITED STATES COURT OF APPEALS**

**FOR THE FOURTH CIRCUIT**

UNITED STATES OF AMERICA,
Plaintiff-Appellee,

v.                                                               No. 94-5951

JAMES BARNETT MILLER,
Defendant-Appellant.

Appeal from the United States District Court
for the Middle District of North Carolina, at Durham.
William L. Osteen, Sr., District Judge.
(CR-93-270)

Argued: December 8, 1995

Decided: March 6, 1996

Before WILKINSON, Chief Judge, and WIDENER and
HAMILTON, Circuit Judges.

_____

Affirmed in part, vacated in part, and remanded for resentencing by
published opinion. Judge Hamilton wrote the opinion, in which Chief
Judge Wilkinson joined. Judge Widener wrote a separate concurring
and dissenting opinion.

_____

**COUNSEL**

**ARGUED:** Gregory Davis, Assistant Federal Public Defender,
Greensboro, North Carolina, for Appellant. Michael Francis Joseph,
Assistant United States Attorney, Greensboro, North Carolina, for
Appellee. **ON BRIEF:** William E. Martin, Federal Public Defender,

Greensboro, North Carolina, for Appellant. Walter C. Holton, Jr.,
United States Attorney, Greensboro, North Carolina, for Appellee.

_____

**OPINION**

HAMILTON, Circuit Judge:

James Barnett Miller (Miller) appeals his sentence following his
plea of guilty to passing and uttering a counterfeit fifty-dollar federal
reserve note, see 18 U.S.C.A. § 472 (West Supp. 1995), and possess-
ing and concealing six counterfeit fifty-dollar federal reserve notes,
see id. Among the questions this appeal raises is whether our decision
in United States v. Johnson, 48 F.3d 806, 808-09 (4th Cir. 1995),
holding that a district court lacks authority to delegate to the proba-
tion officer the final authority to determine the amount and timing of
restitutionary installment payments, without retaining ultimate author-
ity over such decisions, equally applies to fines. We hold it does.
Accordingly, we vacate the fine and restitution order imposed by the
district court. We also vacate that portion of Miller's sentence pertain-
ing to the district court's six-level enhancement of Miller's offense
level pursuant to United States Sentencing Commission, Guidelines
Manual, (USSG) § 2B5.1(b)(2) (Nov. 1994). The case is remanded
for resentencing. Finally, we affirm the district court's refusal to
reduce Miller's offense level by two levels under USSG § 3E1.1 for
acceptance of responsibility.

I.

On December 14, 1993, Miller made seven color photocopies of
both sides of a fifty-dollar United States federal reserve note at the
Kinko Copy Center in Durham, North Carolina. After noticing Mil-
ler's actions, Kinko Copy Center employees asked him to leave. Mil-
ler then used scissors to cut out the photocopied notes, gluing the
corresponding front and backsides together to create counterfeit notes.
On December 15, Miller successfully passed one of the counterfeit
notes to an employee at the Piece Goods Fabric Store in Durham. The
employee did not notice the counterfeit nature of the note until the
store closed for the day. The next day, December 16, Miller unsuc-

2

cessfully attempted to pass the remaining six counterfeit notes at five Durham businesses, and as a result, the police received numerous telephone calls from those merchants reporting that an individual had attempted to pass counterfeit fifty-dollar federal reserve notes at their respective businesses. The Piece Goods Fabric Store also reported Miller's successful passing of a fifty-dollar counterfeit note.

Upon investigation, the police obtained video surveillance tapes from two of the Durham businesses showing Miller attempting to pass the counterfeit notes. The police promptly arrested Miller and found six counterfeit fifty-dollar federal reserve notes in his possession. The Kinko Copy Center employees positively identified Miller as the person who attempted to copy the notes on the color copy machine, and the Piece Goods Fabric Store employee positively identified Miller as the person who passed the counterfeit note at the store. A search of the hotel room in which Miller was staying at the time revealed materials used for counterfeiting the notes: glue, scissors, paper, and green ink.

As a result of Miller's activities during December 14 through December 16, Miller was indicted on one count of unlawfully making a counterfeit fifty-dollar federal reserve note (Count I), see 18 U.S.C.A. § 474 (West Supp. 1995); one count of passing and uttering a counterfeit fifty-dollar federal reserve note, see 18 U.S.C.A. § 472 (Count II); and one count of possessing and concealing six counterfeit fifty-dollar federal reserve notes (Count III), see id. After entering into a written plea agreement with the government, Miller pleaded guilty on April 7, 1994 to Counts II and III of the indictment in exchange for the dismissal of Count I. The district court then released Miller from formal custody and put him under pre-trial supervision pending his sentencing hearing set for August 25, 1994. Sometime between his release from formal custody and his scheduled sentencing hearing, Miller fled to Florida, and thus failed to appear at the sentencing hearing. Miller was subsequently apprehended in Florida and returned to North Carolina for sentencing on December 6, 1994.

Adopting the factual findings and sentencing guidelines application of the presentence report (PSR), the district court initially calculated Miller's total offense level at seventeen and his criminal history category at six. In reaching the offense level calculation, the district court

3

first grouped counts two and three together pursuant to USSG § 3D1.2(d). Then, beginning with a base offense level of nine, see USSG § 2B5.1(a), the district court added six levels based on its findings that Miller had produced counterfeit notes and/or possessed materials used for counterfeiting, see USSG§ 2B5.1(b)(2). Finally, the district court added two levels for Miller's obstruction of justice by fleeing to Florida while on pre-trial supervision and failing to appear at his originally scheduled sentencing hearing, see USSG § 3C1.1. The district court refused to give Miller a two-level reduction for acceptance of responsibility, see USSG 3E1.1, because it concluded that his flight to Florida evidenced his refusal to accept responsibility for his instant crimes.

The district court's calculations having thus far resulted in a sentencing range of fifty-one to sixty-three months' imprisonment, the district court concluded the sentencing range did not reflect the seriousness of Miller's past criminal conduct. Therefore, the district court departed upward three-levels to offense level twenty, resulting in a sentencing range of seventy to eighty-seven months' imprisonment. Under this range, the district court sentenced Miller to seventy-eight months' imprisonment and three years' supervised release.

Next, the district court ordered Miller to pay a $3,000 fine and fifty-dollars restitution to the Piece Goods Fabric Store under the Inmate Financial Responsibility Program, see 28 C.F.R. § 545.10-545.11 (1994). In both its oral pronouncement and written judgment, the district court ordered that Miller make payments toward the $3,000 fine and the fifty-dollar restitution at such times and in such amounts as the Bureau of Prisons and/or the Probation Office may direct.

Miller noted a timely appeal of his sentence, contending the district court erred: (1) in failing to award him a two-level reduction in his base offense level for acceptance of responsibility under USSG § 3E1.1; (2) in increasing his base offense level by six levels under USSG § 2B5.1(b)(2) for producing counterfeit notes and possessing materials used for counterfeiting; and (3) in delegating to the Bureau of Prisons and/or the probation officer the determination of the timing and amount of his installment payments for the fine and order of restitution. We address each assignment of error in turn.

4

II.

First, Miller contends the district court erred by refusing to reduce his offense level by two levels under USSG § 3E1.1 for acceptance of responsibility. He concedes that in most cases where a defendant has received an enhancement for obstruction of justice, see USSG § 3C1.1, the defendant will not be entitled to a reduction for acceptance of responsibility, see USSG § 3E1.1, comment. (n.4). He nevertheless argues that his is an extraordinary case in which both adjustments may apply. The district court's decision whether to grant a two-level reduction for acceptance of responsibility is a factual determination that we review for clear error. See United States v. Castner, 50 F.3d 1267, 1279 (4th Cir. 1995). The district court's decision is not clearly erroneous.

USSG § 3E1.1 provides a two-level reduction in offense level "[i]f a defendant clearly demonstrates acceptance of responsibility for his offense." Application Note 4 provides that "conduct resulting in an enhancement under § 3C1.1 (obstructing or impeding the administration of justice) ordinarily indicates that the defendant has not accepted responsibility for his criminal conduct. There may, however, be extraordinary cases in which adjustments under both §§ 3C1.1 and 3E1.1 apply."

At Miller's sentencing, the district court made several underlying factual findings before ultimately finding Miller had not clearly demonstrated acceptance of responsibility. First, the district court found Miller had willfully and intentionally absented himself from pre-trial supervision and sentencing. Next, the district court found Miller had not reported to his probation officer as required, but instead, telephoned the Assistant United States Attorney and stated that he was going to South America. Based on these findings, the district court concluded that "there was clearly a demonstration of [Miller's] failure to accept the responsibility of his activities . . .." (J.A. 38-39).

Here, Miller urges us to excuse his conduct resulting in his enhancement for obstruction of justice, see USSG § 3C1.1, based on his assertion that he fled out of fear for his life. **1** Miller then argues

_____

**1** The record reflects that on February 23, 1994, while Miller was in custody for a psychological evaluation to determine his mental compe-

5

that absent his flight, he would be entitled to the reduction for acceptance of responsibility because he pleaded guilty and truthfully admitted the conduct composing his offenses of conviction. See USSG § 3E1.1, comment. (n.3).

Accepting as true, for purposes of this appeal, Miller's statement that he fled out of fear for his life, such fear does not excuse Miller's conduct. As the district court aptly noted, Miller had other options besides flight that would not have violated the terms of his pre-trial supervision and would have allowed him to attend his first scheduled sentencing hearing. For example, Miller could have disclosed the threatening letter to his probation officer, a member of the Secret Service, or a member of the local police department, who could have ensured that Miller received appropriate protection. Instead, Miller fled North Carolina to Florida.

Furthermore, once in Florida, Miller's behavior strongly evidenced his refusal to accept responsibility for his criminal conduct. Miller only returned to the court's jurisdiction upon arrest by Tampa, Florida police officers, who were "summoned by Barnett Bank security officers because of a complaint that [Miller] was attempting a check scam." (J.A. 84). Like his conduct resulting in his instant convictions, Miller's attempt at a check scam involved his intent to fraudulently obtain money from businesses. Such behavior belies any notion that he had accepted responsibility for his counterfeiting crimes. See United States v. Reed, 951 F.2d 97, 99-100 (6th Cir. 1991) (defendant's credit card fraud while awaiting sentencing for conviction of credit card fraud evidenced his refusal to accept responsibility), cert. denied, 503 U.S. 996 (1992).

_____

tency to stand trial for the instant offenses, a fellow pre-trial detainee stabbed Miller twenty times. As a result, Miller underwent medical treatment and hospitalization. The pre-trial detainee was criminally charged for his actions and Miller was scheduled to testify against him. Prior to Miller's release on pre-trial supervision, Miller received a threatening letter from his assailant. Although the letter does not appear in the record, the record indicates the district court examined the letter before making its determination on this issue.

6

In sum, we do not believe Miller's case is one of those extraordinary cases warranting both adjustments for obstruction of justice and acceptance of responsibility. The district court's finding that Miller failed to demonstrate clearly his acceptance of responsibility is not clearly erroneous. Accordingly, we affirm the district court's refusal to grant a reduction for acceptance of responsibility.

III.

Next, Miller contends the district court erroneously increased his base offense level by six levels pursuant to USSG§ 2B5.1(b)(2). We agree.

To the extent Miller's assertion of error involves a challenge to the district court's interpretation of USSG § 2B5.1, we apply a <u>de novo</u> standard of review. <u>See United States v. Daughtrey</u>, 874 F.2d 213, 217 (4th Cir. 1989). To the extent Miller's assertion of error challenges the district court's factual findings, we apply the clearly erroneous standard of review. <u>See id.</u>

The guideline applicable to counterfeiting violations is USSG § 2B5.1. The base offense level under USSG§ 2B5.1 is nine. USSG § 2B5.1(a). USSG § 2B5.1(b)(2) provides a six-level enhancement to the base offense level of nine if "the defendant manufactured or produced any counterfeit obligation or security of the United States, or possessed or had custody of or control over a counterfeiting device or materials used for counterfeiting, and the offense level as determined [in USSG § 2B5.1(b)(1)] is less than 15." USSG § 2B5.1(b)(2). The purpose of this enhancement is to provide harsher sentences for individuals who possess counterfeiting devices and produce, rather than merely pass, counterfeit obligations:

> Possession of counterfeiting devices to copy obligations
> . . . of the United States is treated as an aggravated form of
> counterfeiting because of the sophistication and planning
> involved in manufacturing counterfeit obligations and the
> public policy interest in protecting the integrity of govern-
> ment obligations. Similarly, an enhancement is provided for
> a defendant who produces, rather than merely passes, the
> counterfeit items.

7

USSG § 2B5.1, comment. (backg'd.). However, the Commentary to USSG § 2B5.1 is clear that the subsection (b)(2) enhancement does not apply to individuals "who merely photocopy notes or otherwise produce items that are so obviously counterfeit that they are unlikely to be accepted even if subjected to only minimal scrutiny." USSG § 2B5.1, comment. (n.3). Despite the use of the conjunction "or," courts have interpreted Application Note Three to "exclud[e] from subsection (b)(2) those defendants who produce notes, by photocopying or other means, that `are so obviously counterfeit that they are unlikely to be accepted even if subjected to only minimal scrutiny.'" United States v. Bruning, 914 F.2d 212, 213 (10th Cir.), cert. denied, 498 U.S. 990 (1990); see also United States v. Stanley, 23 F.3d 1084, 1086 (6th Cir. 1994); United States v. Taylor , 991 F.2d 533, 535 (9th Cir.), cert. denied, 114 S. Ct. 170 (1993). To read this Application Note as excluding from subsection (b)(2) all persons who produce counterfeit notes by photocopying "would protect even the most successful counterfeiters from the enhanced penalties of subsection (b)(2) based solely on the method of production, photocopying." Bruning, 914 F.2d at 213.

From these principles, we discern two steps for the district court to undertake when determining the applicability of subsection (b)(2). First, the district court should determine whether the defendant "manufactured or produced any counterfeit obligation or security of the United States, or possessed or had custody of or control over a counterfeiting device or materials used for counterfeiting." USSG § 2B5.1(b)(2). If the answer to this question is no, the enhancement does not apply; if the answer is yes, the district court should then determine whether the notes "are so obviously counterfeit that they are unlikely to be accepted even if subjected to only minimal scrutiny." USSG § 2B5.1, comment. (n.3). This latter determination obviously turns on the quality of the notes as counterfeit notes. Several factors are extremely valuable in assessing the quality of the notes as counterfeit notes. They include: (1) physical inspection during the trial or at the sentencing hearing; (2) whether the counterfeit notes were successfully passed; (3) the number of counterfeit notes successfully passed; (4) the proportion of the number of counterfeit notes successfully passed to the number of notes attempted to be passed; and (5) the testimony of a lay witness who accepted one or more of the counterfeit notes or an expert witness who testifies as to the qual-

8

ity of the counterfeit notes. No one factor is dispositive. And we do not believe a far-reaching inquiry is necessary. What is necessary is a common sense judgment on the quality of the counterfeit notes at issue. To assist appellate review, the district court should state its reasons for granting or denying the enhancement on the record.

In this case, the evidence in the record sufficiently supports the district court's finding that Miller had manufactured counterfeit obligations of the United States and possessed materials used for counterfeiting. Specifically, the record shows that Miller had manufactured seven counterfeit obligations of the United States by photocopying the front and backside of a United States federal reserve note, cutting out the photocopies, and gluing the corresponding front and backsides together. The record also shows that Miller had possessed the following materials used in counterfeiting: glue, scissors, paper, and green ink. This evidence is sufficient to support the district court's finding as to the first step.

Whether the notes "are so obviously counterfeit that they are unlikely to be accepted even if subjected to only minimal scrutiny," USSG § 2B5.1, comment. (n.3), is another matter. Based solely on Miller's success in passing one of the counterfeit notes, the district court, without physically inspecting or viewing any of the seven counterfeit notes, found that the counterfeit notes were not so obviously counterfeit that they were unlikely to be accepted even if subjected to only minimal scrutiny.

Miller points to two facts in support of his argument that the district court's finding is clearly erroneous. First, and foremost, he points to the poor quality of the notes. Second, he points to the fact that, while he tried to pass others, only one note in seven was passed.

At this point, we are reluctant to review the district court's finding because, under the circumstances of this case, we consider it prudent for the district court to have conducted a physical inspection of the counterfeit notes involved or to have taken testimony regarding their quality. This case is materially different from other cases in which appellate courts have upheld the same factual finding without the district court having physically inspected the counterfeit notes or taken testimony regarding their quality. For example, in Stanley, 23 F.3d at

9

1086, the defendant and a co-defendant had successfully passed "a substantial number" of counterfeit notes. See also United States v. Gaither, 1 F.3d 1040, 1044 (10th Cir. 1993) (thirty-three counterfeit notes passed). In such a case, the role of physical inspection or testimony is much less important because the large number of the counterfeit notes passed gives strong indicia that the notes were not so obviously counterfeit that they were unlikely to be accepted even if subjected to only minimal scrutiny. In contrast to Stanley and Gaither, here, only one note in seven was successfully passed. And we believe this fact alone is not sufficient to warrant the enhancement. However, the district court did not have the benefit of the aforementioned analysis. Under such circumstances, we believe the prudent course is to vacate the enhancement and remand the case to the district court to allow the district court to revisit the issue with the guidance set forth herein.[2] Any finding made by the district court upon remand will be subject to a clearly erroneous standard of review.

IV.

Lastly, Miller contends the district court's delegation of its authority to establish the installment amount and timing of his fine and restitution payments to the Federal Bureau of Prisons and/or the United

_____

[2] We find no merit to Miller's argument that the subsection (b)(2) enhancement was inappropriate due to the dollar amount involved ($350) and the level of sophistication of the counterfeiting materials that Miller possessed (glue, scissors, paper, and green ink). The Background Note to USSG § 2B5.1 makes clear that the Sentencing Commission intends the sentencing enhancement under USSG § 2B5.1(b)(2) to apply to a defendant who, rather than merely passing a counterfeit note, either possesses a counterfeiting device or materials used for counterfeiting or produces a counterfeit note. Under this explanation, we see no basis to support Miller's argument that the enhancement should not apply in his case due to the counterfeiting materials he possessed or the dollar amount of counterfeit notes involved. To accept Miller's argument would limit application of the subsection (b)(2) enhancement to a monetary minimum and to a level of sophistication of the counterfeiting materials possessed that the language of USSG § 2B5.1 and its accompanying commentary do not provide. Here, Miller meets both alternative bases provided in the Background Note: he possessed materials used for producing counterfeit notes and did in fact produce counterfeit notes.

States probation officer was error that requires us to vacate his sentence and remand for resentencing. We agree.

In United States v. Johnson, 48 F.3d 806, 808-09 (4th Cir. 1995), we held that a district court lacks authority to delegate to the probation officer the final authority to determine the amount of restitutionary installment payments, without retaining ultimate authority over such decisions. Ultimate authority can be retained by requiring the probation officer to recommend restitutionary decisions for approval by the court. Id. at 809. We reasoned that the statutory duty imposed upon district courts under 18 U.S.C.A. § 3663(f)(1) (West Supp. 1995) "to fix the terms of restitution must be read as exclusive because the imposition of a sentence, including any terms for probation or supervised release, is a core judicial function." Id. at 808. We recognized that courts may use nonjudicial officers, such as probation officers, to support judicial functions, as long as a judicial officer retains and exercises ultimate responsibility.[3]

Although Johnson involved the district court's delegation of authority to set the amount and timing of restitutionary installment payments, its reasoning equally applies when the delegation involves a fine. Title 18 U.S.C.A. § 3572(d) (West Supp. 1995) provides that a "person sentenced to pay a fine or other monetary penalty shall make such payment immediately, unless, in the interest of justice, the court provides for payment on a date certain or in installments." This section as well as § 3663(f)(1), setting forth the district court's statutory duty to fix the terms of restitution, both impose upon the "court" the responsibility for determining installment payments. Like restitution, the statutory duty imposed upon district courts to fix the terms of a fine must be read as exclusive because the imposition of a sentence, including the terms of probation or supervised release, is a core judicial function. Accordingly, we hold a district court may not delegate its authority to set the amount and timing of fine payments to the Bureau of Prisons or the probation officer. See United States v. Kassar, 47 F.3d 562, 568 (2d Cir. 1995) (holding that a district court may not delegate its responsibility under 18 U.S.C.A. § 3572 for determining installment payments with regard to a fine).

_____

[3] We recognize that the district court did not have the benefit of Johnson when Miller was sentenced.

11

Applying our holding here, we conclude the district court erroneously delegated its authority to set the amount and timing of Miller's fine and restitution payments to the Bureau of Prisons and/or the probation officer, without retaining ultimate authority over such decisions. Therefore, the portion of Miller's sentence relating to the fine and restitution must be vacated.

V.

In conclusion, we affirm the district court's refusal to reduce Miller's offense level for acceptance of responsibility, see 3E1.1., but vacate Miller's sentence with respect to the six-level enhancement under USSG § 2B5.1(b)(2) and the district court's delegation of the determination of the amount and timing of Miller's restitution and fine payments to the Bureau of Prisons and/or the probation officer. On both these last issues, we remand the case for resentencing.

AFFIRMED IN PART, VACATED IN PART, AND REMANDED FOR RESENTENCING

WIDENER, Circuit Judge, concurring and dissenting:

I concur in all of the opinion of the majority except Part III.

As to part III, I do not agree with its implicit conclusion as clearly erroneous the finding of the district court that the counterfeit notes were not so obviously counterfeit that they were unlikely to be accepted even if subjected to only minimal scrutiny. As to that conclusion, I respectfully dissent. I would affirm.