**UNPUBLISHED**

**UNITED STATES COURT OF APPEALS**

**FOR THE FOURTH CIRCUIT**

UNITED STATES OF AMERICA,
Plaintiff-Appellee,

v.                                                                     No. 95-5305

RANDEL WILLIAMS,
Defendant-Appellant.

Appeal from the United States District Court
for the Western District of North Carolina, at Asheville.
Charles E. Simons, Jr., Senior District Judge.
(CR-94-35)

Argued: October 31, 1996

Decided: March 4, 1997

Before WILKINSON, Chief Judge, LUTTIG, Circuit Judge, and
BUTZNER, Senior Circuit Judge.

_____

Affirmed in part, vacated in part, and remanded for resentencing by
unpublished per curiam opinion.

_____

**COUNSEL**

**ARGUED:** John Stuart Bruce, Deputy Federal Public Defender,
Greensboro, North Carolina, for Appellant. Robert James Conrad, Jr.,
Assistant United States Attorney, Charlotte, North Carolina, for
Appellee. **ON BRIEF:** William E. Martin, Federal Public Defender,
Greensboro, North Carolina, for Appellant. Mark T. Calloway, United
States Attorney, Charlotte, North Carolina, for Appellee.

_____

Unpublished opinions are not binding precedent in this circuit. See Local Rule 36(c).

_____

**OPINION**

PER CURIAM:

Randel Williams was convicted of possession with the intent to distribute marijuana and cocaine base and with conspiracy to possess with the intent to distribute marijuana and cocaine base under 21 U.S.C.A. §§ 841 and 846 (1994). He raises numerous issues on appeal. We affirm the rulings of the district court relating to Williams' conviction and the amount of drugs attributable to him at sentencing, but we vacate the portion of his sentencing relating to the fine and restitution imposed by the district court because the schedule of payment was impermissibly delegated to the probation officer.

I

Williams, Alton Fearon, and Diane Branch lived together in a small motel room in Hendersonville, North Carolina. Fearon and Branch rented the room, and Williams moved in with them shortly after he was released from prison. At 11 p.m. on March 13, 1993, Fearon asked Branch to drive Williams and him to a wooded field just outside Brown's Labor Camp on Route 25. The labor camp was an area notorious for drug trafficking that had recently been shut down by the United States Marshal pursuant to a government investigation. Branch came back to pick up Williams and Fearon close to midnight, but she had to pull off to the side of the road and wait briefly for them to return to her car.

Henderson County Sheriff's Deputy Juan Hernandez saw Branch's vehicle sitting off the side of the highway with its lights turned off. Hernandez thought that the car might be disabled and that its occupants might need roadside assistance. When he pulled his patrol car alongside the parked car to offer assistance, the parked car's lights came on. Hernandez made eye contact with the driver, Diane Branch, but she quickly drove away. Hernandez followed the car for about

2

three-quarters of a mile. He observed an unusual amount of activity among the passengers inside and saw the car swerve off of the highway onto the gravel shoulder. He initiated a traffic stop to ascertain whether the driver was impaired.

Hernandez approached the vehicle and began to ask Branch a series of routine questions. He smelled marijuana in the car and saw a brown bag containing green vegetation that he believed was marijuana. He also recognized two of the passengers, Fearon and Williams, as former residents of Brown's Labor Camp. Hernandez arrested and searched the three suspects. He found a kitchen knife on Fearon and crack cocaine on Williams.

Police detectives searched the car Branch had been driving and found 5.13 grams of crack cocaine, 2.4 kilograms of marijuana, and over $7,000 in cash. The marijuana was found inside two garbage bags that were wet and muddy, "as if [they] had been outside." Police suspected that the marijuana had been dug from the ground near the labor camp. They knew that the labor camp was often used for illicit drug transactions and that both Williams and Fearon were former residents of the camp. Police also noticed that Williams' and Fearon's boots were covered in fresh mud, as were the bottom of their pants. Early that morning, three police officers found 321 grams of cocaine base inside a freshly dug hole near the labor camp. Fearon's distinctive shoe print was found around the hole. Later that day, police searched the motel room and found almost $14,000 in cash.

A grand jury returned a three-count indictment charging Williams, Fearon, and Branch with drug trafficking offenses. Branch plead guilty and agreed to testify for the government in exchange for a sentence of no more than five years. Williams was convicted on all three counts and was sentenced to 361 months imprisonment.

II

Williams claims that the district court erred in denying his motion to suppress the evidence of drugs found on his person and in the vehicle. He contends that Hernandez had no reasonable suspicion to stop the vehicle and that all evidence arising out of the initial stop must be suppressed. We review the trial court's ultimate conclusion in a

3

motion to suppress de novo. Ornelas v. United States, 116 S.Ct. 1657, 1662 (1996).

The government asserts that Rakas v. Illinois, 439 U.S. 128 (1978), precludes Williams' standing to challenge the stop of Branch's vehicle. In Rakas, the Supreme Court held that a passenger lacks standing to challenge the search of a vehicle. Id. at 143. Williams distinguishes Rakas on the ground that he is challenging the stop of the vehicle, not the search of its contents.

We have recognized this distinction and permitted passengers to challenge the initial stop of a car. United States v. Rusher, 966 F.2d 868, 874, n.4 (4th Cir. 1992); accord United States v. Kimball, 25 F.3d 1, 5-6 (1st Cir. 1994) ("the interest in freedom of movement and the interest in being free from fear and surprise are personal to all occupants of the vehicle."). We find that the stop was justified. An ordinary traffic stop constitutes a limited seizure of the occupants of a vehicle, and we analyze the reasonableness of such a stop under the familiar rubric of Terry v. Ohio, 392 U.S. 1 (1968). Berkemer v. McCarty, 468 U.S. 420, 439 (1992). Terry requires that an officer must have a "specific and articuable" suspicion that criminal activity is taking place before making an investigatory stop. Terry, 392 U.S. at 21. Whether an officer's suspicion of criminal activity is reasonable is determined by the totality of the circumstances. United States v. Sokolow, 490 U.S. 1, 9 (1989). The circumstances courts consider include the "characteristics of the area where the stop occurs, the time of the stop . . . and any suspicious conduct of the person accosted such as an obvious attempt to avoid officers or any nervous conduct on the discovery of their presence." United States v. Bull, 565 F.2d 869, 871 (4th Cir. 1977).

Hernandez came upon Branch's vehicle on the side of a dark highway at midnight. The car was 100 yards from an area notorious for drug trafficking and its lights were turned off. When he pulled over to see if the vehicle was in need of roadside assistance, he made eye contact with Branch, who immediately drove away rather than stopping to speak with the officer. As Hernandez followed her car, he noticed nervous and irregular movements among the occupants in the vehicle, "like they were trying to hide something." When the car

4

swerved off of the road, he suspected the driver may have been drinking, and "it was [his] duty to get them off the highway."

When these underlying facts are taken together and processed through the eyes of a police officer experienced in drug investigations, they take on a "less innocent hue." United States v. Tate, 648 F.2d 939, 942-43 (4th Cir. 1981). Based upon the series of strange and suspicious behavior witnessed by Hernandez, we find that a Terry stop was proper.

III

Count One of the indictment charged Williams with conspiracy to possess with the intent to distribute less than 50 kilograms of marijuana and more than 50 grams of cocaine base. Williams contends that the indictment is duplicitous because it charges him for two separate offenses which carry "dramatically" different penalties. He also contends that the charge of "less than 50 kilograms" of marijuana was prejudicial to him since the government knew that only 2.4 kilograms of marijuana was involved in the offense.

Because Williams did not raise these objections at trial, he waives his right to appeal. Fed. R. Crim. P. 12(f), United States v. Price, 763 F.2d 640, 643 (4th Cir. 1985). Even reviewing for plain error, Williams cannot prevail. An indictment may properly charge a conspiracy involving more than two illegal substances in a single count. United States v. Murray, 618 F.2d 892, 896-97 (2d Cir. 1980). Drug quantities are not essential elements of drug trafficking offenses. United States v. Powell, 886 F.2d 81, 85 (4th Cir. 1989). The amount of marijuana charged in the indictment was not intended to prejudice the jury, but to put Williams on notice of the maximum sentencing penalties for drug trafficking offenses involving "less than 50 kilograms" set forth in 21 U.S.C. 841(b)(1)(D). See appellee's brief at 20.

IV

During the government's examination of codefendant Branch, the prosecutor asked a series of questions attempting to tie the defendants together as coconspirators. When the prosecutor asked Branch when

5

Williams came to live at the motel with Fearon and her, Branch responded, "when he got out of jail." The defendant offered no objection. The prosecutor made a reference to the "jail" remark during his closing argument. Williams argues that the trial court erred in admitting this evidence of Williams's prior incarceration.

Even though Williams did not object to the admission of this testimony at trial, we are authorized to correct "plain errors" committed in the district court. Fed. R. Crim. P. 52(b); United States v. Mitchell, 1 F.3d 235, 239 (4th Cir. 1993). An error rises to the level of plain error only if it "undermine[s] the fundamental fairness of the trial and contribute[s] to a miscarriage of justice." Id. at 240. We do not review each isolated allegation of error in a vacuum, but within the context of the entire trial proceeding. Id.

Neither Branch's response nor the prosecutor's argument affected the fundamental fairness of the trial. The prosecution's line of questioning was designed to establish a conspiratorial relationship among Williams, Fearon and Branch. Specifically, the government intended to link Williams to the motel room shared by Fearon and Branch where large unexplained amounts of cash were found. There is no evidence that the prosecution intentionally elicited Branch's "in jail" response or that it prejudiced the jury in any material way. Similarly, the prosecution referred to Williams' confinement in jail during closing argument. Because the jail references were interwoven with the underlying relevant facts to be proved in this case, they did not violate the substantial rights of the defendant or result in a miscarriage of justice.

V

Williams claims that the court erred in attempting to define reasonable doubt in its instructions to the jury. Again, Williams did not raise this alleged error at trial, so we review for plain error.

The district court told the jury that "reasonable doubt has no technical, legal meaning. Legally, reasonable doubt, as used in this trial and these instructions, has its usual and customary meaning . . . ." This instruction does not rise to the level of plain error.

6

VI

Williams argues that the evidence was insufficient to support the conspiracy conviction. On appeal, we view the evidence in the light most favorable to the government to determine whether it supports the jury's verdict. Glasser v. United States, 315 U.S. 60, 80 (1942).

The essential elements of a conspiracy are (1) an agreement between two or more persons, which constitutes the act; and (2) an intent thereby to achieve an unlawful objective. United States v. Burgos, 94 F.3d 849, 860 (4th Cir. 1996). If a conspiracy is proved, the evidence "need only establish a slight connection between the defendant and the conspiracy to support the conviction." Id. at 861. This slight connection, however, must be proved beyond a reasonable doubt. Id.

The evidence showed that on the night of the arrest, police found quantities of marijuana, cocaine base, and cash on both Williams' and Fearon's persons, in their motel room, and in a freshly dug hole near Brown's labor camp. Both Williams and Fearon had been in the woods next to the labor camp shortly before their arrest. Police observed that both Williams' and Fearon had mud covering their boots and the bottom of their pants. The next morning, police investi-gators found cocaine base stuffed into a freshly dug hole at the labor camp. Fearon's distinctive shoe print was discovered near the hole. There were dirty, wet bags of marijuana found in the car and wet piles of money in the motel room. The evidence is sufficient for a jury to conclude that Williams and Fearon agreed to enter into a criminal partnership to possess and distribute marijuana and cocaine base and that their method of operation was to use the motel room and the hole as hideaways for the drugs and cash.

VII

Williams contends that the district court erred in calculating the amount of crack cocaine and marijuana attributable to him. The pre-sentence report attributed 326.83 grams of cocaine base and 2.4 kilo-grams of marijuana to Williams. These quantities were computed from drugs found on Williams' person, in the car, and in the freshly dug hole near the labor camp. Williams admits that he is responsible

7

for the 2.4 kilograms of marijuana found on his person. He also admits that he is responsible for 5.13 grams of crack found on his person and in the beer can found at his feet in the car. Williams denies responsibility for the remaining 321.7 grams of cocaine base that police found in the freshly dug hole near Brown's Labor Camp. Williams admits going to the labor camp with Fearon that night, but claims that he knew nothing about drugs in a hole. He maintains that Fearon told him that they were going to the labor camp to get some money and some papers.

We review the district court's findings on drug quantities attributable to a defendant for clear error. United States v. D'Anjou, 16 F.3d 604, 614 (4th Cir. 1994). Williams is accountable for all criminal conduct of his co-conspirators done in furtherance of the conspiracy that was reasonably foreseeable to him. USSG § 1B1.3, comment (n.2) (Nov. 1995).

A jury properly convicted Williams of conspiracy. The evidence indicated that the drugs found on Williams' person, in the vehicle in which he was riding, and in the hole near the labor camp, were all connected to the conspiracy. Williams testified that he accompanied Fearon to a site near the labor camp on the night of his arrest. It was reasonably foreseeable to Williams that this trip in the middle of the night to an abandoned area was in furtherance of the conspiracy to possess and distribute drugs.

VIII

Williams' final arguments relate to the fines and restitution imposed upon him by the district court. The court fined Williams $2,500.00 for a violating § 841(a)(1), ordered that he reimburse the government for the costs of court-appointed counsel, and ordered that the fine and reimbursement be paid according to the terms established by the probation officer. Williams challenges the court's findings on his ability to pay the fine and reimbursement. He also challenges the district court's delegation of the timing of payments to the probation officer. Williams did not raise these objections at trial and we review only for plain error.

The district court should not delegate its authority to establish the payment terms of any unpaid fines and reimbursement as a condition

8

of supervised release. In United States v. Miller, 77 F.3d 71, 77-78 (4th Cir. 1996), this court held that a district court could not delegate its authority to set the amount and timing of restitutionary payments or fines to the Bureau of Prisons or a probation officer without retaining ultimate authority over such decisions. We noted that "the statutory duty imposed upon district courts to fix the terms of a fine must be read as exclusive because the imposition of a sentence, including the terms of probation or supervised release, is a core judicial function." Id. at 78.

The district court initially ordered Williams to pay the fine and reimbursement immediately if he had the financial arrangements to do so. The court also ordered that if Williams was unable to pay immediately, he must pay the fine and reimbursement as a condition of his supervised release "on a schedule to be established by the probation officer." Williams was not able to pay immediately, and so the probation officer retained authority over the timing of payments for the entire amount of Williams' court-ordered financial obligations. This delegation was impermissible in light of Miller . This is not to say that the district court may not enlist the assistance of the probation officer in setting the schedule for the payment of restitution and fines. Miller holds that the probation officer may be involved in this process so long as the district court retains "ultimate authority." 77 F.3d at 77. "Ultimate authority can be retained by requiring the probation officer to recommend restitutionary decisions for approval by the court." Id.

We decline to accept the government's argument that Miller applies only to the amount of the required payment and not to its timing. Miller should not be read in such a narrow way. The schedule for paying installments has an impact on both the government and the prisoner. This provision of supervised release is "core judicial function." Id. at 78. The portion of Williams' sentence relating to the fine must be vacated and remanded for resentencing.

AFFIRMED IN PART; VACATED IN PART; AND REMANDED FOR RESENTENCING

9