**UNITED STATES of America**

v.

**Adam Benjamin GUFFEY**

**No. 1:99–CR–99.**

United States District Court,
E.D. Tennessee.

May 18, 2000.

John C Cavett, Jr, Barry L Abbott, Cavett & Abbott, Chattanooga, TN, for Adam B Guffey, defendant.

Gary S. Humble, U.S. Dept. of Justice, Washington, DC, for U.S.

### MEMORANDUM OPINION

COLLIER, District Judge.

Before the Court is an issue requiring a determination regarding the applicability of United States Sentencing Guideline ("U.S.S.G.") § 2B5.1(b)(2) to a Defendant convicted of using a modern home personal computer to make counterfeit Federal Reserve Notes.

### I. BACKGROUND

On October 27, 1999, the Grand Jury for the Eastern District of Tennessee returned a two-count indictment charging 20–year–old Defendant Adam Benjamin Guffey in Count One with making counterfeit obligations of the United States, i.e. $20 Federal Reserve Notes, in violation of 18 U.S.C. § 471, and in Count Two with

passing and attempting to pass counterfeit notes in violation of 18 U.S.C. § 472 (Court File No. 1). On February 11, 2000, Defendant appeared before the Court pursuant to *Fed.R.Crim.P.* 11 to enter a guilty plea to Count One of the indictment. The guilty plea was pursuant to a written plea agreement (Court File No. 11).[1] Paragraph 7 of the plea agreement provided the following factual basis for the plea:

> On July 3, 1999, Mr. Guffey passed two counterfeit federal reserve notes ("FRNs") at Mr. Zip's convenience store, Riceville, TN, and one $20 FRN at Mr. Zip's convenience store in Decatur, TN. There were additional passes of counterfeit FRNs at other locations in Athens, TN and Calhoun, TN on July 4, 1999. Mr. Guffey admits manufacturing the counterfeit notes and passing them.

After complying with the requirements of Rule 11, the Court accepted Defendant's guilty plea and adjudged him guilty on Count One of the indictment. As part of the plea agreement, the Government agreed to dismiss Count Two of the indictment at Defendant's sentencing. The Court set sentencing for Friday, May 5, 2000.

### A. Presentence Investigation Report

Prior to the scheduled sentencing hearing, the United States Probation Office prepared a Presentence Investigation Report ("PSR") which the probation officer disclosed to the parties on March 31, 2000. Paragraph 8 of the Offense Conduct part of the PSR contains the facts of the offense. This paragraph states Defendant used his mother's newly acquired home personal computer, color printer and scanner to copy a twenty dollar bill. According to this paragraph, Defendant then made several copies of the bill and passed or attempted to pass them at businesses in McMinn and Meigs Counties, Tennessee. Paragraph 11 of the PSR states Defendant admits to making ten of the counterfeit

---

1. The original plea agreement (Court File No. 8) did not account for Count Two of the indictment, thus a corrected plea agreement was filed with the Court.

notes. The probation officer also indicates ten of the counterfeit notes were actually passed and two were found on Defendant's person at the time of his arrest.

In the PSR the probation officer lists the base offense level for a violation of 18 U.S.C. § 471 as nine pursuant to U.S.S.G. § 2B5.1. However, the probation officer increased the base offense level to 15 after applying the specific offense characteristic at U.S.S.G. § 2B5.1(b)(2) which provides for an increase of the base offense level to 15 if the defendant manufactured the currency or exercised control over the manufacturing equipment. From the adjusted offense level of 15, the probation officer reduced the offense level by two for acceptance of responsibility under U.S.S.G. § 3E1.1(a), resulting in a total offense level of 13. Because Defendant had two prior convictions, he had a criminal history category of II. A total offense level 13 and a criminal history of category II resulted in a sentencing guideline range of 15 to 21 months. *See* United States Sentencing Commission, *Guidelines Manual*, Sentencing Table (Nov.1998).

### B. Objections To The PSR

On April 5, 2000, after receiving the PSR, counsel for Defendant submitted objections to the PSR to the probation officer. Defendant disagreed *inter alia* with the offense conduct calculation. Specifically, the defense objected to the application of the specific offense characteristic found at U.S.S.G. § 2B5.1(b)(2) which establishes a base offense level of 15 if the defendant "manufactured or produced any counterfeit ..." The defense argued Application Note 4[2] clarifies this subsection and indicates the subsection does not apply to "persons who merely photocopy notes or otherwise produce items that are so obviously counterfeit that they are unlikely to be accepted even if subjected to only mini-

mal scrutiny." Defendant contended use of a scanner and printer is no more sophisticated than use of a copier. Additionally, the defense reserved the right to argue the quality of the counterfeit notes as he had not yet been able to examine them.

At the sentencing hearing the Court heard argument by counsel on this issue and also personally examined the counterfeit notes. From the Court's personal observation the counterfeit notes were of very high quality and could easily be taken as genuine. That several store clerks accepted the notes as genuine only adds corroboration to the Court's finding, by a preponderance of the evidence, that the counterfeit notes manufactured by the defendant were not "so obviously counterfeit that they [were] unlikely to be accepted even if subjected to only minimal scrutiny."

### II. *DISCUSSION*

The relevant provision of the sentencing guidelines provides as follows:

> § 2B5.1 *Offenses Involving Counterfeit Bearer Obligations of the United States*
>
> (a) Base Offense Level: **9**
>
> (b) Specific Offense Characteristics
>
> . . . . .
>
> (2) If the defendant manufactured or produced any counterfeit obligation of security or the United States or possessed or had custody of or control over a counterfeiting device or materials used for counterfeiting, and the offense level as determined above is less than **15**, increase to **15**.

Application Note 4 to this section states:

> *Subsection (b)(2) does not apply to persons who merely photocopy notes or otherwise produce items that are so obvi-*

---

**2.** In the 1999 version of the United States Sentencing Commission Guidelines Manual used in this case, this note is Application Note 4. The note was renumbered as part of a November 1997 amendment. (*See*

U.S.S.G.App. C, amend. 554). Some of the appellate cases discussing this issue and using an earlier version of the Guidelines Manual therefore refer to this same note as Application Note 3.

*ously counterfeit that they are unlikely to be accepted even if subjected to only minimal scrutiny.*

Defendant argued in his objections to the PSR his use of a scanner, computer and printer was analogous to "merely photocopy[ing]" thus the enhancement should not apply.

The substance of Application Note 4 has been in effect since the Guideline Manual was first issued in 1987.[3] From reading the Application Note, it appears the drafters of the Note intended to distinguish between those individuals who produced high quality counterfeit notes using technical and/or sophisticated equipment, and those who made low quality, clearly counterfeit notes using a less sophisticated process. The background notes to this section substantiate this view. The notes provide:

*Possession of counterfeiting devices to copy obligations (including securities) of the United States is treated as an aggravated form of counterfeiting* **because of the sophistication and planning involved in manufacturing counterfeit obligations** *and the public policy interest in protecting the integrity of government obligations. Similarly, an enhancement is provided for a defendant who produces, rather than merely passes, the counterfeit items.*

U.S.S.G. § 2B5.1, comment. (backg'd) (emphasis added). This background commentary clearly demonstrates the drafters considered the degree of sophistication traditionally believed to be involved in counterfeiting to be relevant to sentencing. This type of activity warrants an enhancement because arguably, the more sophisticated the technique and equipment used, the higher quality counterfeit that results, and the more likely this counterfeit will be successfully introduced into the nation's economy. At that time, the drafters likely considered the traditional means of counterfeiting, i.e. using a printing press, to be a more advanced means of producing counterfeit because it required specialized machinery, equipment and training. In contrast, most of the rudimentary photocopy machines employed over a decade ago only made copies in black and white, not color, and the quality of the reproduction was relatively poor by today's standards. Therefore, counterfeit produced by photocopy machines posed less of a threat to the nation's economy.

In the years since the Sentencing Commission first issued the Guideline Manual, technology has greatly advanced, leaving Application Note 4 somewhat outdated.[4] The use of, and access to, highly technical, sophisticated equipment capable of producing quality counterfeit no longer requires specialized training. Today's personal

3. The original version of this Application Note provided:

*Subsection (b)(2) does not apply to persons who merely photocopy notes, paste corners of notes on notes of a different denomination, or otherwise produce items that are so obviously counterfeit that they are unlikely to be accepted even if subjected to minimal scrutiny.*

U.S.S.G. § 2B5.1, comment. (n. 2) (1987). The November 1, 1989 amendment eliminated the language concerning pasting of corners since another guideline section covered altered obligations. *See* U.S.S.G.App. C, amend. 115.

4. Senator Ben Nighthorse Campbell (R. Colorado) has introduced a bill into Congress entitled the "Counterfeiting Sentencing Enhancement Act of 1998" which would "tighten the sentencing guidelines' base offense level in

recognition of the fact that advances in computer and printing technology have fundamentally changed the nature of counterfeiting." *See* 144 Cong.Rec. S5218–01, S5226 (daily ed. May 20, 1998) (statement of Sen. Campbell). The proposed bill calls for:

(1) a sentencing enhancement of not less than 2 levels, with respect to the base level for offenses involving counterfeit bearer obligations of the United States, as described in section 2B5.1 of the Federal sentencing guidelines; and

(2) an additional sentencing enhancement of not less than 2 levels, with respect to any offense described in paragraph (1) that involves the use of a computer printer or color photocopying machine.

*Id.;* S.2099, 105th Cong. (1998).

computers and the concomitant accessories have turned once difficult, time consuming tasks into quick and easy projects for even the least technology-savvy individual. The hardware is powerful, the software sophisticated, and the technology is, for the most part, user friendly. In addition computer equipment is widely available and relatively inexpensive. Although our technological growth has benefitted society enormously, these advances also unfortunately facilitate crimes such as counterfeiting and make their detection more difficult. Unlike the printing presses of years past, modern personal computers require no specialized training or experience and individuals using a computer can easily make excellent quality counterfeit. Moreover, instead of only a small percentage of the population having access to sophisticated machines capable of producing high quality counterfeit notes, computers are in the homes and offices of a large percentage of the population.[5]

This case exemplifies the lack of specialized knowledge necessary to make passable counterfeit currency using a modern personal computer. Defendant in this case

---

**5.** In addition to the bill introduced by Senator Campbell, several reports have been made to Congressional Committees concerning the problems generated by computer counterfeiting and the efforts to address the issue. For example, Mr. Lewis C. Merlitte, Director of the United States Secret Service stated the following to the Senate Subcommittee on Appropriations:

> Counterfeiting production methods have evolved over the years, from the traditional method of offset printing to color copiers and more recently, to scanners, computers and inkjet printers. Today's counterfeiter with little training, skill or experience, can produce counterfeit currency with computer skills obtained through trial and error and public information. Counterfeiters using computers could transmit quality images of U.S. currency anywhere, via the internet.
> Of the domestic counterfeit currency printing operations suppressed during fiscal year 1997, 73% were inkjet in nature, as compared to 19% in fiscal year 1995. Currency counterfeiting through the use of computers is likely to increase, since these instruments of production are readily available and continue to improve.

1998 WL 86619 (F.D.C.H). As part of the means to combat the computer counterfeiting trend, Director Merletti indicated "Secretary Rubin has asked the Justice Department to join Treasury in working with the United States Sentencing Commission to review the guideline ranges of imprisonment for counterfeiting cases." *Id.*

The House of Representatives Subcommittee on Domestic and International Monetary Policy Committee on Banking and Financial Services has also had discussions of this growing problem. Chairman Michael N. Castle stated the following in a hearing concerning currency counterfeiting by computer:

> We are here today because the Secret Service, the Treasury, and the United States of America are facing an alarming new challenge to the integrity of our national currency. Over the past two to three years, the face of counterfeiting has changed dramatically. The classic movie cliche of the ink-stained master engraver painstakingly touching up his counterfeit printing plates, has now given way to amateurs, often suburban teen-aged computer hackers, or drug-dealing urban street gangs. The price of admission to commit the felony of counterfeiting has suddenly dropped from years of skilled apprenticeship and access to expensive professional equipment to anyone with the inclination, a personal computer and a color ink-jet printer. All that is required to produce passable bills may be computer equipment no more advanced than what 40% of American families already own, plus a printer that can be purchased for as little as $200.

> We should ... look into toughening laws and sentencing guidelines for this very serious crime. Otherwise we may find ourselves in a situation where PC counterfeiters are only given a slap on the wrist and can reclaim the computers used in the crime because only a few notes were actually confiscated, notwithstanding evidence of images that may exist on CD ROM or hard disk memory devices. PC counterfeiting has become a "print to order crime" and previous sentencing guidelines based on total amounts of counterfeit notes seized should not apply.

1998 WL 161566 (F.D.C.H); *see also* Statement of Thomas A. Ferguson, Acting Director, Bureau of Engraving and Printing, 1998 WL 161565 (F.D.C.H.); Statement of Dennis F. Lynch, Special Agent in Charge, Secret Service Counterfeit Division, 1998 WL 164209 (F.D.C.H).

simply placed a $20 bill on his mother's scanner, copied the note onto his mother's hard drive, and then printed the note using his mother's color printer and the computer's software. Although Defendant did not employ a sophisticated technique, the technology and equipment he used, that is the computer software, the scanner, the personal computer, and the color copier, were very sophisticated. In 1987 when Application Note 4 was first issued, such easily obtainable and user-friendly equipment capable of reproducing high quality duplicates either did not exist or was not readily available to significant numbers of the population. Thus although Defendant's actions in this case may have been comparable to mere photocopying in terms of its relative simplicity, the Court concludes the drafters intended with the enhancement, and by explanation with Application Note 4, to punish more harshly those who, like Defendant in this case, use sophisticated equipment to produce high quality, passable counterfeit. Accordingly, the Court finds the probation officer correctly applied the specific offense characteristic to Defendant's conduct.

A review of the applicable case law further validates the Court's conclusion. In a case nearly identical to the case *sub judice,* the United States Court of Appeals for the Fifth Circuit rejected an argument the counterfeiting process used by the defendant in that case, that is, using a color scanner, color printer, computer equipment, computer software, and a personal computer, was tantamount to mere photocopying. *United States v. Bollman,* 141 F.3d 184, 186 (5th Cir.1998). The *Bollman* court also rejected the argument the counterfeit notes produced were not well made and were obviously counterfeit.

In *United States v. Johnson,* 172 F.3d 879 (Table), 1999 WL 143933, at *1 (10th Cir. Mar. 17, 1999) the United States Court of Appeals for the Tenth Circuit reached a similar conclusion on a case involving similar facts as those in *Bollman* and those before this Court. In that case

the defendants purchased a color copier and produced over $2,600.00 worth of counterfeit currency in various denominations. At the sentencing hearing, the government presented evidence the counterfeit currency was of passable quality, and even of higher quality than some counterfeit produced with an offset press. The defendants had in fact successfully passed approximately $1,700.00 at convenience stores and restaurants in several states. The district court found the counterfeit notes were passable, but declined to apply the enhancement at § 2B5.1(b)(2) based on Application Note 4. At the sentencing hearing the district judge stated:

It appears to me the application note means nothing if we have reached the point where all color copiers are capable of making passable quality money. You know, I know there were some early attempts to just limit application note 4 to saying that it doesn't apply to persons who merely photocopy notes or otherwise produce items. But you know then it was "the otherwise produced items that are so obviously counterfeit they're unlikely to be accepted, even if subjected to only minimum scrutiny," that kind of became the test.

From your testimony today, that test doesn't exist anymore. These machines are capable of producing money that is certainly going to be passable, certainly acceptable. They have reached that point where the quality is so good that, I admit, I couldn't tell. Mr. Johnson talks about being a little too green or a little dark or a little this or that. You know, it looks like money. And if you're in a store that takes money, why you're likely to accept it.

Now, it's my interpretation, and you're welcome—of course, you always have a right to go to the Tenth Circuit, but you'd have my blessing if you wanted to go and get the latest reading on this, but it seems like to me it only makes sense that this 2B5.1(b) to be interpreted to mean something more

than a copier bought off of the floor of a retail store and ordinary bond paper.

.    .    .    .    .

It's as unsophisticated as this crime can be committed. You have a few beers and you decide to go buy a photo copier and you run off some notes and you run around and pass it. I mean, it's so stupid it's ludicrous. And I don't see how—I just don't see how this makes any sense if we enhance that base level of conduct.

I'd be much—I just think what needs to happen is the Sentencing Commission needs to look at this, and we either ought to have a base level of 9 for just use of a photo copier and bond paper and nothing else, or we ought to have a base offense level of 15 for this.

So I'm going to grant the—both defendants' objections with regard to 2B5.1(b)(2). I don't think that is appropriate under these circumstances, and I don't think the—to hold otherwise, this application note 4 would become totally meaningless. And I'm going to try to give some credit to the Commission for having something in mind when they put that application note in there.

*Id.* at \*1–2. On appeal the Tenth Circuit found the district court erred in failing to apply § 2B5.1(b)(2) in light of the fact the district court found the currency to be passable. In particular the Appeals Court found the district court erred in that it "read a 'sophistication' requirement into the subsection and application note that is not there." *Id.* at \*2. The Tenth Circuit further opined:

Although the district court was apparently concerned the application note had been rendered null by new photocopy machines that make it easy for the average person to produce passable quality counterfeit currency, we do not share than concern. Even assuming a state-of-the-art copy machine makes the counterfeiter's task easier, it is not inevitable that passable quality counterfeit currency will be produced. As defendants'

own admissions in this case indicate, it still takes some effort on the part of the counterfeiter to produce a passable quality product. If copier technology some day actually nullifies the application note, it would be "the role of the Sentencing Commission, not the courts, to ... revise the Guidelines as needed." *United States v. Jones,* 158 F.3d 492, 505 n. 9 (10th Cir.1998).

*Id.* at \*3.

In addition, the United States Court of Appeals for the Sixth Circuit has concluded the dispositive test as to whether the enhancement at § 2B5.1(b)(2) applies is whether the reproduced notes were "so obviously counterfeit that they were unlikely to be accepted," not whether they were merely photocopied. *United States v. Stanley,* 23 F.3d 1084, 1085 (6th Cir. 1994). *Accord United States v. Locke,* 187 F.3d 638 (Table), 1999 WL 426528, at \*1 (6th Cir. June 15, 1999); *United States v. Sparks,* 61 F.3d 904 (Table), 1995 WL 411831, at \*1 (6th Cir. July 11, 1995); *see also United States v. Kennealy,* 972 F.2d 349 (Table), 1992 WL 180178, at \*1 (6th Cir. July 29, 1992). Thus even a defendant who produces counterfeit notes by mere photocopying is subject to the enhancement unless the end product is obviously counterfeit. Other Circuit Courts of Appeal agree. *E.g. United States v. Wyjack,* 141 F.3d 181, 183 (5th Cir.1998); *United States v. Miller,* 77 F.3d 71, 75–76 (4th Cir.1996); *United States v. Taylor,* 991 F.2d 533, 535 (9th Cir.), *cert. denied,* 510 U.S. 858, 114 S.Ct. 170, 126 L.Ed.2d 129 (1993); *United States v. Bruning,* 914 F.2d 212, 213 (10th Cir.), *cert. denied,* 498 U.S. 990, 111 S.Ct. 531, 112 L.Ed.2d 541 (1990). Such a test which focuses on the quality of the counterfeit, as well as the relative sophistication of the equipment used to produce it, more clearly aligns with the guideline drafters' intent in enacting the enhancement.

As the Court previously stated, it examined the counterfeit currency at issue in

this case and found it to be passable. Defendant succeeded in passing several of the counterfeit notes. Thus, from the Court's view, the Defendant did not produce items that are "so obviously counterfeit that they are unlikely to be accepted," and the enhancement found at U.S.S.G. § 2B5.1(b)(2) applies.

## III. *CONCLUSION*

The Court finds Defendant in this case manufactured high quality counterfeit notes which were not so obviously counterfeit that they were unlikely to be accepted. The Court further concludes Defendant used sophisticated computer equipment to produce the counterfeit currency. Thus, Application Note 4 of U.S.S.G. § 2B5.1 does not preclude the application of the enhancement at subsection (b)(2) to this case. Accordingly, the Court concludes the PSR is correct and Defendant's guideline range has been accurately calculated.