

2007 Decisions

Opinions of the United
States Court of Appeals
for the Third Circuit

9-10-2007

# USA v. Amponsah

Precedential or Non-Precedential: Non-Precedential

Docket No. 05-3641

Follow this and additional works at: http://digitalcommons.law.villanova.edu/thirdcircuit_2007

Recommended Citation

"USA v. Amponsah" (2007). *2007 Decisions*. Paper 456.
http://digitalcommons.law.villanova.edu/thirdcircuit_2007/456

This decision is brought to you for free and open access by the Opinions of the United States Court of Appeals for the Third Circuit at Villanova
University School of Law Digital Repository. It has been accepted for inclusion in 2007 Decisions by an authorized administrator of Villanova
University School of Law Digital Repository. For more information, please contact Benjamin.Carlson@law.villanova.edu.

NOT PRECEDENTIAL

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT

_____

No. 05-3641
_____

UNITED STATES OF AMERICA

v.

YAW AMPONSAH,

Appellant.

_____

On Appeal from the United States District Court
for the District of New Jersey
(D.C. No. 01-cr-00479)
District Judge: Honorable Mary Little Cooper

_____

Submitted Under Third Circuit LAR 34.1(a),
June 28, 2007

Before: BARRY, FUENTES, and GARTH, Circuit Judges.

(Filed: September 10, 2007)

_____

OPINION OF THE COURT

_____

FUENTES, Circuit Judge.

After appellant Yaw Amponsah pleaded guilty to one count of conspiracy to distribute and possess more than 500 grams of cocaine in violation of 21 U.S.C. §§ 841(a)(1) and (b)(1)(B) and 21 U.S.C. § 846, the District Court sentenced him to 155 months in prison.  Amponsah's principal argument on appeal is that his sentence is unreasonable.  For the reasons set forth below, we will affirm the sentence.

## I.  BACKGROUND

In 1988, Amponsah, a citizen of Ghana, entered the United States on a student visa and thereafter remained in the country illegally.  Around 2001, the government received information from a cooperating witness in an ongoing narcotics investigation that, after arriving in the country, Amponsah served as a drug courier for a New Jersey-based drug-trafficking ring known as the "Garba Organization."  On May 28, 2001, federal agents attempted to interview Amponsah at his home in Fords, New Jersey.  Agents initially confronted Amponsah about his immigration status, but Amponsah refused to provide any information without an attorney present.  Before terminating the interview, agents informed Amponsah that he was the target of a federal narcotics investigation and instructed him to have his attorney contact federal authorities.

One month later, on June 25, 2001, Amponsah voluntarily met with federal agents after they informed him they had received additional information concerning his drug-trafficking activities.  During the meeting, Amponsah confirmed that, in 1996, he smuggled 2 to 3 kilograms of cocaine from New Jersey to London on behalf of the Garba Organization; later recruited two other couriers to participate in drug-smuggling trips;

2

and, in March 1997, invested his own money in a smuggling venture. In two subsequent meetings with federal authorities on July 2 and 10, 2001, Amponsah provided additional information about several individuals involved in the Garba Organization.

On July 19, 2001, Amponsah was charged in a one-count indictment with conspiracy to distribute and possess more than 500 grams of cocaine, contrary to 21 U.S.C. §§ 841(a)(1) and (b)(1)(B), in violation of 21 U.S.C. § 846, an offense that carries a mandatory minimum term of imprisonment of 5 years and a maximum term of imprisonment of 40 years.[1] At his arraignment in August 2001, the United States District Court for the District of New Jersey placed Amponsah under pretrial supervision, the terms of which required him to surrender his travel documents and remain within the New York-New Jersey metropolitan area.

In October 2001, Amponsah entered into a written plea agreement with the government which included the following stipulations concerning application of the United States Sentencing Guidelines: (1) the offense involved at least 5 but less than 15 kilograms of cocaine, resulting in a base offense level of 32 under § 2D1.1(c)(4); (2) if his

---

[1] Section 841(a)(1) renders it unlawful for any person knowingly or intentionally "to manufacture, distribute, or dispense, or possess with intent to manufacture, distribute, or dispense, a controlled substance." 21 U.S.C. § 841(a)(1). Section 841(b)(1)(B) provides, in relevant part, that an individual who violates § 841(a) by committing an offense that involves more than 500 grams of a cocaine "shall be sentenced to a term of imprisonment which may not be less than 5 years and not more than 40 years." 21 U.S.C. § 841(b)(1)(B). Section 846 provides that "[a]ny person who attempts or conspires to commit any offense defined in this subchapter shall be subject to the same penalties as those prescribed for the offense, the commission of which was the object of the attempt or conspiracy." 21 U.S.C. § 846.

cooperation with the government continued through the date of sentencing, Amponsah would be entitled to a 2-level reduction for acceptance of responsibility pursuant to § 3E1.1(a); (3) based on his willingness to plead guilty, Amponsah would be entitled to an additional 1-level reduction for acceptance of responsibility pursuant to § 3E1.1(b); (4) because he did not play an aggravating or a mitigating role in the offense, there would be neither an increase nor a decrease in offense level pursuant to § 3B1.1 or § 3B1.2, respectively; and (5) based on the foregoing, the total offense level would be 29.

In addition, the plea agreement provided that the government retained "sole discretion" to determine whether Amponsah fully complied with the terms of the agreement and to seek a reduction for substantial assistance pursuant to § 5K1.1. The plea agreement further stated that "[t]he sentence to be imposed is within the sole discretion of the sentencing judge" and the government "cannot and does not make any representation or promise as to what guideline range will be found applicable . . . or as to what sentence Yaw Amponsah will ultimately receive." (Appellant's Appx. at 91.)

At a plea hearing held on December 19, 2001, the District Court engaged Amponsah in an extensive colloquy concerning the terms of the plea agreement and the binding nature of the stipulations set forth therein. After affirming that he entered into the agreement knowingly and voluntarily, Amponsah pled guilty. He was thereafter continued on release under the supervision of the United States Probation Office pending sentencing.

Several significant developments took place before his sentencing. In February

4

2003, Joe Mensah, a close friend of Amponsah's, was tried on a related federal drug-trafficking charge. Although the government interviewed Amponsah in preparation for Mensah's trial, federal prosecutors decided not to call Amponsah as a witness because of his "evasiveness" during pre-trial preparation. At his trial, Mensah testified that prior to his indictment, Amponsah tipped him off about the government's investigation and informed him that the government attempted to persuade him to wear a wire and record their conversations.[2] Although much of Mensah's trial testimony was not credible, the government believed this aspect of his testimony because, aside from government agents involved in the investigation, Amponsah was the only individual who knew about the wire request.

In April 2003, after Mensah was convicted, the government confronted Amponsah about Mensah's trial testimony. Amponsah denied that he had informed Mensah about the government's investigation, but could not explain how Mensah learned about the wire request. As a result, the government informed Amponsah that his § 5K1 letter was in jeopardy. Several days later, Amponsah fraudulently obtained travel documents from the Ghanian consulate in New York and, on April 23, 2003, fled to Ghana. In August 2003, Ghanian authorities arrested Amponsah and extradited him to the United States.

On July 25, 2005, after a three-day sentencing hearing, the District Court imposed

---

[2]Amponsah's plea agreement specifically provided that "[f]ull cooperation includes participating, if requested, in affirmative investigative techniques, such as . . . tape recording conversations." (Appellant's Appx. at 90.).

a sentence of 155 months of imprisonment. In calculating the recommended Guidelines range, the District Court enforced the stipulations concerning drug quantity set forth in the plea agreement, imposed a 2-level enhancement for obstruction of justice, denied Amponsah reductions for minor role and acceptance of responsibility, and found him ineligible for safety valve relief. In addition, the District Court concluded that the government did not act in bad faith by declining to move for a § 5K1.1 reduction for substantial assistance. Based on the District Court's calculations, Amponsah was assigned a total offense level of 34 which, when combined with a criminal history category of I, resulted in a recommended Guidelines range of 151 to 188 months of imprisonment.[3]

Turning to the sentencing factors set forth in 18 U.S.C. § 3553(a), the District Court noted that a sentence at the upper end of the recommended Guidelines range was justified. The District Court nevertheless credited Amponsah for his partial cooperation with the government and sentenced him at the lower end of the range. In addition, as a special condition of supervised release, the District Court required Amponsah to cooperate with immigration officials to resolve any issues related to his status in the United States and instructed him not to re-enter the country if deported unless he obtained the written permission of the United States Attorney General. The District Court entered

---

[3] Between the time Amponsah pleaded guilty and his sentencing, the Supreme Court issued its decision in United States v. Booker, 543 U.S. 220 (2005), which rendered the Guidelines advisory. In calculating Amponsah's advisory sentencing range, the District Court applied the 2004 version of the Guidelines.

the judgment of conviction and sentence on July 28, 2005. This timely appeal followed.

## II. JURISDICTION AND STANDARD OF REVIEW

We have jurisdiction over this appeal pursuant to 18 U.S.C. § 3742(a)(1). See

United States v. Cooper, 437 F.3d 324, 327 (3d Cir. 2006). When reviewing a district

court's imposition of sentence, we review its factual findings for clear error. United

States v. Grier, 475 F.3d 556, 570 (3d Cir. 2007) (en banc). We exercise plenary review

over a district court's interpretation of the Guidelines and its resolution of constitutional

issues. McKoy, 452 F.3d 234, 236 (3d Cir. 2006). We review the ultimate sentence

imposed for reasonableness. Cooper, 437 F.3d at 327.

## III. ANALYSIS

We first address the issues relating to the District Court's Guidelines calculations,

and then briefly address the constitutional claims raised in Amponsah's pro se

supplemental brief.[4]

---

[4]    After counsel filed his opening brief on appeal, Amponsah filed a pro se
"Motion for Permission to File A Supplemental Brief" which asserts additional arguments
not raised in counsel's brief. Although a party represented by counsel is typically
prohibited from filing a pro se brief, Third Circuit Local Appellate Rule 31.3 provides
that "[c]ounsel may choose to include the arguments in his or her brief or may in unusual
circumstances file a motion to file a supplemental brief, if appropriate." 3d Cir. R. 31.3.
Here, counsel filed a "Motion to File Supplemental Brief," adopting the arguments set
forth in the pro se brief. We granted both motions. In addition, on February 23, 2007,
Amponsah filed a pro se motion entitled "Permission to File Motion to Supplement Brief"
based on Cunningham v. California, 127 S. Ct. 856 (2007), which counsel subsequently
adopted on March 14, 2007. Although we note that Rule 28(j) of the Federal Rules of
Appellate Procedure allows a party to submit a letter citing supplemental authority
without first seeking permission of the Court, we nevertheless granted the motion.

### A. The District Court's Guidelines Calculation

Amponsah challenges the District Court's (1) calculation of his base offense level; (2) rulings on obstruction of justice and acceptance of responsibility; (3) denial of safety valve relief; and (4) determination that the government's refusal to move for a § 5K1.1 reduction for substantial assistance was not in bad faith. We address each of these arguments in turn.

### 1) Base Offense Level

Amponsah's base offense level corresponds to the 5 to 15 kilograms of cocaine stipulated to by the parties in the plea agreement. He contends, however, that the factual record was insufficient to support the stipulation. We disagree. At his sentencing hearing, the District Court noted that "[o]f course, the Court needs to satisfy itself that the quantity to which the parties had stipulated . . . [has] an adequate factual basis and that the quantity has been calculated correctly." (Appellee's Appx. at 97.) Amponsah correctly points out that the District Court stated that the drug quantity set forth in the pre-sentence investigation report ("PSR") was "not quite sufficient to provide the factual basis for a finding of 5 to 15 kilograms because it refers to the two to three kilograms that Mr. Amponsah carried in his courier trip. It does not refer to . . . the additional quantities that were carried by other couriers recruited by Amponsah." The District Court did not, however, end its analysis there. (Appellee's Appx. at 97-98.)

Rather, the District Court went on to observe that Amponsah admitted in his plea allocution that he (1) served as a courier in the 1996 drug-smuggling trip, and (2)

8

recruited two couriers who later smuggled additional quantities of cocaine. In addition, the government proffered the testimony of a convicted member of the Garba Organization which would purportedly establish that the 1996 courier trip involved 2 to 3 kilograms of cocaine, and that the two couriers Amponsah recruited smuggled an additional 3 kilograms of cocaine each. Amponsah declined the District Court's invitation to conduct an evidentiary hearing on this issue. Accordingly, the District Court credited the government's proffer and concluded that there was sufficient evidence in the record to establish that the offense involved at least 8 to 9 kilograms of cocaine, well within the 5 to 15 kilogram range stipulated to in the plea agreement.[5] Based on the foregoing, we fail to see how the District Court's drug quantity determination was clearly erroneous.[6]

---

[5] In attributing to Amponsah the additional 6 kilograms of cocaine smuggled by the two couriers, the District Court noted that § 1B1.3 of the Guidelines provides, in relevant part, that "in the case of jointly undertaken criminal activity," a defendant's base offense level shall be determined on the basis of "all reasonably foreseeable acts and omissions of others in furtherance of the jointly undertaken criminal activity." U.S. Sentencing Guidelines Manual § 1B1.3(a).

[6] In his pro se supplemental brief, Amponsah asserts, for the first time, that the District Court's reliance on his proffer statements to determine drug quantity violates § 1B1.8 of the Guidelines, which provides, in relevant part:

> Where a defendant agrees to cooperate with the government by providing information concerning unlawful activities of others, and as part of that agreement the government agrees that self-incriminating information provided pursuant to that agreement will not be used against the defendant, then such information shall not be used in determining the applicable guideline range, except to the extent provided in the agreement.

U.S. Sentencing Guidelines Manual § 1B1.8(a). The government correctly points out that, in the plea agreement, the government expressly reserved the right to provide the District Court with all information relevant to sentencing, "including information provided by Yaw Amponsah before and after signing [the plea] agreement and protected

9

*2) Obstruction of Justice and Acceptance of Responsibility*

Because of Amponsah's flight to Ghana, as well as the evidence indicating that he warned Joe Mensah about the government's investigation, the District Court imposed a 2-level increase for obstruction of justice pursuant to § 3C1.1, and denied a 3-level reduction for acceptance of responsibility pursuant to § 3E.1.1. We discern no error in either of the District Court's rulings.

Section 3C1.1 provides that a two-level enhancement is appropriate where the defendant "willfully obstructed or impeded, or attempted to obstruct or impede, the administration of justice during the course of the investigation, prosecution, or sentencing of the . . . offense." U.S. Sentencing Guidelines Manual § 3C1.1. Application Note 4 to § 3C1.1 states that "escaping or attempting to escape from custody before trial or sentencing" is an example of the type of conduct to which the enhancement applies. U.S. Sentencing Guidelines Manual § 3C1.1, cmt. n.4.

Section 3E1.1(a) allows a district court to grant a 2-level decrease in offense level if "defendant clearly demonstrates acceptance of responsibility for his offense." U.S. Sentencing Guidelines Manual § 3E1.1(a). If a defendant receives such a reduction, he is eligible for an additional 1-level decrease if the offense level (prior to application of § 3E1.1(a)) is greater than 16. U.S. Sentencing Guidelines Manual § 3E1.1(B).

_____

by U.S.S.G. 1B1.8." (Appellant's Appx. at 91.) In any event, as set forth above, the District Court's drug quantity determination was not based solely on Amponsah's plea allocution.

Application Note 4 to § 3E1.1 provides that except in "extraordinary circumstances," conduct resulting in an enhancement for obstruction of justice "ordinarily indicates that the defendant has not accepted responsibility for his criminal conduct." U.S. Sentencing Guidelines Manual § 3E1.1, cmt. n.4.

Assuming for purposes of its § 3C1.1 analysis that Amponsah's motivation for fleeing the United States was fear of retaliation from members of the Garba Organization, the District Court concluded that an enhancement was nevertheless warranted. Given that it is uncontested that Amponsah fled to Ghana, we conclude that the enhancement was entirely reasonable. See e.g., United States v. Muro, 357 F.3d 743, 745 (8th Cir. 2004) ("Although the district court found credible [defendant's] claim of fear for his safety, it reasonably concluded that [defendant] willfully chose the course of conduct that obstructed justice instead of choosing other options, such as contacting [the government] to report the threat."). Likewise, we do not think it was clearly erroneous for the District Court to conclude that the record evidence did not establish "extraordinary circumstances" that would justify a reduction for acceptance of responsibility. See, e.g., United States v. Miller, 77 F.3d 71, 77 (4th Cir. 1996) ("Accepting as true, for purposes of this appeal, [defendant's] statement that he fled out of fear for his life, such fear does not excuse [his] conduct.").

In sum, we are not persuaded that the District Court's rulings with respect to obstruction of justice and acceptance of responsibility were improper.

*3) Safety Valve Relief*

11

Section 5C1.2, the so-called "safety valve" provision of the Guidelines, allows a

district court to impose a sentence below the statutory mandatory minimum, provided the

defendant meets certain specific requirements. In this case, the District Court found

Amponsah ineligible for safety valve relief, because he failed to satisfy the requirement

that "not later than the time of the sentencing hearing, the defendant has truthfully

provided to the Government all information and evidence the defendant has concerning

the offense or offenses that were part of the same course of conduct or of a common

scheme or plan." See U.S. Sentencing Guidelines Manual § 5C1.2(a)(5).

Amponsah argues that the District Court did not identify any useful information

that he could have provided to the government and, therefore, should have granted him a

safety valve reduction. Amponsah's argument is contradicted by the record, which shows

that he provided the government with vague and contradictory information concerning

Joe Mensah's drug-trafficking activities. We therefore find no error in the District

Court's conclusion that:

> The fact that he was not consistent concerning what he knew about [Joe]
> Mensah's criminal activity and the fact that he did nothing to correct his
> inconsistent responses to the Government in time for the Government either
> to make use of Mr. Amponsah's information at Mensah's trial or even down
> to today . . . leads this Court to conclude that Mr. Amponsah is not entitled
> to the safety valve.

(Appellee's Appx. at 310.)

### 4) § 5K1.1 Motion for Substantial Assistance

Amponsah argues that the District Court relied on inadmissible hearsay in

determining that the government did not act in bad faith when it refused to move for a § 5K1.1 reduction for substantial assistance. Specifically, Amponsah argues that the District Court improperly relied on the statement of Special Agent Tim Mahoney of the United States Immigration and Customs Enforcement that Joe Mensah testified at his trial that Amponsah warned him about the government's investigation. Amponsah's hearsay argument is entirely meritless, as it is well-settled that "[h]earsay is fully admissible at a sentencing hearing, so long as it has sufficient indicia of reliability." United States v. Brigman, 350 F.3d 310, 315 (3d Cir. 2003); see also U.S. Sentencing Guidelines Manual § 6A1.3(a) ("In resolving any dispute concerning a factor important to the sentencing determination, the court may consider relevant information without regard to its admissibility under the rules of evidence applicable at trial, provided that the information has sufficient indicia of reliability to support its probable accuracy."). Having reviewed the record, we conclude that the District Court did not err in concluding that Agent Mahoney's testimony was sufficiently reliable so as to provide a reasonable basis for the government's decision not to move for a § 5K1.1 reduction in sentence.

## B. Additional Arguments Raised in Amponsah's Supplemental Pro Se Brief

In his pro se supplemental brief, Amponsah argues that the sentence imposed violates his Sixth Amendment rights under Booker. In addition, he contends that the District Court improperly ordered him deported. Both arguments patently lack merit.

### 1) Booker Argument

In United States v. Booker, the Supreme Court held that the mandatory nature of

13

the Guidelines "violated the Sixth Amendment because it made sentence enhancement dependent on facts not proved to a jury beyond a reasonable doubt." McKoy, 452 F.3d at 239. The Supreme Court remedied this constitutional infirmity by holding that the Guidelines are advisory. Id. Accordingly, under the current advisory Guidelines regime, a district court may "impose a sentence anywhere under [the statutory] maximum without . . . proof beyond a reasonable doubt." Grier, 475 F.3d at 565.

Amponsah's Booker argument is defective because, contrary to the assertions set forth in his pro se supplemental brief, the District Court did not treat the Guidelines as mandatory. Rather, the District Court was well aware of the advisory nature of the Guidelines and sentenced Amponsah after first calculating the recommended Guidelines range, and then exercising its sentencing discretion under § 3553(a).[7] The 155-month sentence imposed by the District Court, which was at the low end of the recommended range, was well below the maximum 40 years of imprisonment provided for by statute. We therefore fail to see how the sentence raises any Sixth Amendment concerns. Indeed, Amponsah's entire Sixth Amendment argument rests on the mistaken assertion that the maximum sentence for the offense to which he pleaded guilty was five years of

---

[7] In arguing that his sentence was unreasonable, Amponsah does not contend that the District Court improperly applied the sentencing factors set forth in § 3553(a), but rather, focuses exclusively on the District Court's Guidelines calculations. We nevertheless note that our review of record shows that the District Court carefully and thoroughly applied all of the sentencing factors set forth in § 3553(a), including the recommended Guidelines range, in reaching its sentencing determination.

14

imprisonment.[8]

### 2) Immigration Status

Amponsah's argument that the District Court "improperly ordered his deportation" likewise lacks merit. In setting forth the special conditions of supervised release, the District Court ordered Amponsah to "cooperate with the immigration services to resolve his status in the United States" and, if deported, prohibited him from reentering the country without the written permission of the United States Attorney General. (Appellee's Appx. at 350.) The government is correct that these conditions of supervised release were entirely proper. See, e.g., United States v. Tinoso, 327 F3d. 864, 866 n.2 (9th Cir 2003) (noting that several Courts of Appeals have held that district courts may, as a condition of supervised release under 18 U.S.C. § 3583(d), order a criminal defendant to surrender to immigration officials upon completion of a term of imprisonment and to remain outside of the United States if deported).

## IV. CONCLUSION

For the foregoing reasons, we will affirm the sentence imposed by the District Court.

---

[8] The Supreme Court decision in Cunningham v. California, which Amponsah relies on in his Rule 28(j) letter, is also unavailing. Cunningham, which involved California's determinate sentencing law, presented a set of issues entirely inapposite to this case.